# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | | |
|---|---|---|
| JUDY BOYER, | : | |
| Plaintiff, | : | |
| v. | : | 7:06-cv-027 (HL) |
| TIFT COUNTY HOSPITAL AUTHORITY d/b/a TIFT REGIONAL MEDICAL CENTER, | : | |
| Defendant. | : | |

## O R D E R

At issue in this federal question action is whether a hospital's treatment of a patient violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). The controversial treatment was alleged to have taken place while she was hospitalized at the Tift County Regional Medical Center ("TRMC"), Defendant hospital in this case. Plaintiff has been deaf since childhood. Her primary method of communication is sign language, though she is capable of reading lips. Plaintiff filed the present action alleging that Defendant hospital's failure to provide her a certified interpreter prevented her from being able to communicate while she was an admitted patient, violating the ADA in the process. Plaintiff further alleges that Defendant hospital intentionally inflicted emotional distress upon her.

Currently pending before this Court is Defendant's Motion for Summary Judgment (doc. 21). Through the motion, Defendant seeks an entry of judgment in its favor on all of Plaintiff's claims. Defendant contends that it effectively communicated with Plaintiff, her hearing disability notwithstanding, and that it did not inflict any emotional distress. Having considered the parties' briefs and the applicable law, the Court presents its findings below.

## I. FACTS

### A. Judy Boyer's Background

Construing the facts in the light most favorable to Plaintiff, the non-moving party, the Court finds as follows. Plaintiff Judy Boyer is a fifty-four-year-old woman who resides in Tift County, Georgia. Although not born hearing impaired, Plaintiff has been deaf since the age of three. Her primary method of communication is American Sign Language ("ASL"). While Plaintiff has the use of her voice and can speak, the majority of what she says is not understandable to the hearing population. Plaintiff also has the ability to read lips, although not every word is discernible. If Plaintiff is unable to communicate through ASL, lipreading, or speaking, she has the ability to write and read handwritten messages. However, because of differences in vocabulary and syntax between ASL and English, handwritten messages are not an ideal alternative for Plaintiff when discussing complex matters. Plaintiff is married to Glen Boyer, who is also deaf. The couple have two children, Lamar Boyer and Tammy Gregory, who have the ability to hear but are skilled in sign language.

### B. Judy Boyer's Surgery and Hospitalization

On March 24, 2004, Plaintiff consulted with her gynecologist, Dr. Nathan Mordel, to discuss an upcoming surgical procedure. During the consultation, Plaintiff signed two forms consenting to surgery to repair her bladder. Plaintiff left Dr. Mordel's office and went to TRMC for a preoperative evaluation. While at TRMC, Plaintiff signed a Consent for Medical Treatment and executed an informed consent for anesthesia services. Five days later, on March 29, Plaintiff returned to TRMC for the outpatient surgery to repair her bladder. Plaintiff experienced complications after her surgery and had to be hospitalized. On April 7, 2004, she underwent exploratory surgery to determine the problem. Apparently, during Plaintiff's bladder surgery, her small intestine was perforated, allowing the contents of her bowel to leak into her abdominal cavity, creating a life-threatening condition. Dr.

2

David McEachin performed the exploratory surgery, and repaired Plaintiff's perforated bowel. At some point after the surgery, Plaintiff went into septic shock and had to be placed in the Critical Care Unit, where she remained for eight days. Ultimately, Plaintiff remained hospitalized until May 26, 2004.

      **C.**      **Communication with Judy Boyer**

Plaintiff's children, who were both skilled signers, have acted as interpreters for their parents when dealing with their parents' medical care. Throughout Plaintiff's hospitalization with Defendant, her children would interpret for her or her husband when Plaintiff was unable to communicate with the doctors or nurses assigned to her. Lamar Boyer, Plaintiff's son, was first called to the hospital to interpret for his mother two days after her initial surgery. One of Defendant's nurses contacted him to request that he come to the hospital to interpret for Plaintiff. She was to undergo a procedure that required her assistance. The procedure consisted of a tube being inserted down Plaintiff's throat. When Lamar arrived at the hospital, Defendant's nurses had already performed the procedure without first explaining to Plaintiff exactly what it entailed. Plaintiff was under the impression that she was about to be administered medicine. Plaintiff was visibly disturbed after undergoing the tube insertion considering she was not prepared for such an invasive procedure and vomited uncontrollably as a result.

Lamar questioned the nurses about an interpreter for his mother, but was told that it didn't seem necessary. Later, on April 6, Lamar was again called out to the hospital to interpret for his mother and explain another procedure she was to undergo in relation to a blood clot. Again Lamar inquired about the possibility of an interpreter for his mother, this time talking with one of the physicians assigned to her. The next day, Plaintiff underwent the exploratory surgery. Afterwards, Lamar spoke for the first time with Louise Woodham, the Patient Representative at TRMC. It was

during this conversation that Woodham was first made aware of a deaf patient being treated at Defendant hospital in need of a sign language interpreter. Lamar requested a certified sign language interpreter be assigned to his mother to assist her in communicating with her treating physicians and nurses, and Woodham agreed to look for one. No interpreter was immediately assigned, so the following day, Lamar contacted the Georgia Advocacy Office ("GAO") for assistance in securing an interpreter. Lamar spoke with attorney Robert Raubach, who contacted Defendant hospital and informed it of Lamar's complaint and that the hospital was in violation of the law for not providing Plaintiff with a certified interpreter.

On April 12, 2004, Angie King, Director of Quality Management for Defendant hospital responded to Attorney Raubach's letter by calling him and informing him that Ms. Debra Drawdy, a friend of the Plaintiff, had been acting as an interpreter for Plaintiff. However, Ms. Drawdy had only been contacted by Defendant hospital on April 7. Attorney Raubach sent another letter to Defendant hospital memorializing the phone call, reiterating that no certified interpreter had been provided for Plaintiff. While the parties disagree as to the events that took place in the interim, namely Defendant hospital's efforts to secure a qualified interpreter, there is no dispute that Ms. Kitty LaFountain, a certified sign language interpreter, was not present to interpret for Plaintiff until April 24, close to a month after she was first admitted. Ultimately, on April 27, Defendant hospital entered into an agreement with Mr. Larry Daughtery to provide interpreting services.

## II. SUMMARY JUDGMENT STANDARD

If "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," then summary judgment must be granted. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the non-moving party. Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995). The Court may not, however, make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" which would entitle the moving party to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted). If the moving party meets this burden, the burden then shifts to the non-moving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the non-moving party is not entitled to a judgment as a matter o f law. Id. at 324-26. This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this scheme summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### III. DISCUSSION

Plaintiff's three-count Complaint alleges violations of the ADA and the RA, intentional infliction of emotional distress, and punitive damages. Defendant moves this Court for a grant of summary judgment with respect to all of Plaintiff's claims, and entry of judgment in its favor.

5

## A. ADA/RA Violations

In Count One of Plaintiff's Complaint, she alleges that Defendant failed to take the necessary steps to accommodate handicapped persons like herself. Specifically, Plaintiff contends that Defendant violated federal law by not providing qualified interpreters or auxiliary aids and by not implementing a procedure for effective communication. Plaintiff asserts her claim under Title II of the ADA, which proscribes discrimination by public entities against individuals with disabilities.[1] In addition to the ADA, Plaintiff also proceeds under the RA, a companion statute that also prohibits disability discrimination, but is limited to those public entities receiving federal financial assistance.[2] "The ADA and the RA are similar in substance and, with the exception of the RA's federal funding requirement, cases interpreting either are applicable and interchangeable." Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999) (internal quotation marks omitted); see Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) ("The standard for determining liability under the Rehabilitation Act is the same as that under the [ADA]; thus, cases involving the ADA are precedent for those involving the [RA].).

For Plaintiff to state her claims under Title II of the ADA or under the RA, she must allege:

---

[1] Title II of the ADA, in its entirety, states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

[2] The RA, in its entirety, states:
> No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794.

(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated [against] by such entity; (3) by reason of such disability. See Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001). Here, Defendant concedes the first and third elements of the ADA/RA analysis but challenges the allegation that Plaintiff was denied the benefits of services or programs offered by TRMC. Specifically, Defendant contends that while Plaintiff was hospitalized, "there was not any diagnostic or surgical procedure performed between March 29, 2004 through May 26, 2004 that she did not give her consent [sic] and that all diagnostic and surgical procedures were explained to her." (Def's. Memo, doc. 21-2, at 12.) A proper analysis of the ADA/RA requirements demands a reading of the Code of Federal Regulations ("CFR").

### 1. CFR regulations

To determine what is required of Defendant, the Court looks to regulations to gain insight in to what is effective communication. "Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, see 42 U.S.C. § 12134(a), the Court must give these regulations 'legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute.'" Tugg v. Towey, 864 F. Supp. 1201, 1205 n.6 (S.D. Fla. 1994) (citing United States v. Morton, 467 U.S. 822, 834 (1984)).

The federal regulations promulgated to elucidate Title II of the ADA, "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a). Further, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of,

a service, program, or activity conducted by a public entity." 28 C.F.R. § 35.160(b)(1). "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160(b)(2). The regulations go on to define "auxiliary aids and services" as including:

> Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments . . . .

28 C.F.R. § 35.104. A "qualified interpreter" is "able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary." Id.

The regulations charge Defendant hospital with the responsibility of taking steps to ensure that it could communicate with Plaintiff as effectively as it could communicate with its hearing patients. Further, Defendant hospital was responsible for furnishing Plaintiff with a qualified interpreter–if she so desired–so she could be properly treated while hospitalized.

In this case, Defendant contends that Plaintiff received effective communication because she consented to every surgical and diagnostic procedure she underwent while a patient at TRMC. Further, Defendant claims that Plaintiff had "no problems communicating with the doctors by talking with them, reading lips and writing notes." (Def's. Memo, doc. 21-2 at 12.) In essence, Defendant argues that because of the presence of her children, as well as her own abilities to communicate with her doctors, it "did not have notice that additional auxiliary aids were necessary or desired to afford Mrs. Boyer an equal opportunity to participate in, and enjoy the benefits of the services offered by the hospital." (Id. at 13.) Defendant relies on the "where necessary" language from the regulations to support its position that Plaintiff received effective communication, i.e. auxiliary aids were not

8

necessary here because Plaintiff could communicate with her doctors and consented to every procedure. Plaintiff directly challenges Defendant's assertions. Plaintiff avers that Defendant knew of her requests for an auxiliary aid in the form of a certified sign language interpreter, and that the methods of communication Plaintiff was forced to implement were not effective as contemplated by the Code of Federal Regulations.

Both parties present evidence that Plaintiff's son, Lamar, contacted Woodham to request a certified sign language interpreter. This contravenes Defendant's assertion that it was not on notice that Plaintiff desired the services of an interpreter. This case is replete with evidence that Plaintiff desired a certified interpreter. Plaintiff's son inquired multiple times, and even contacted the GAO, which faxed a letter to Defendant hospital. Noticeably absent from Defendant's argument in support of effective communication is any mention of the interpreters it did attempt to bring in. In essence, Defendant's argument can only be then that it complied with Title II of the ADA and the supporting regulations' mandate of effective communication because a deaf patient consented to the procedures she underwent at the hospital. Defendant cites the availability of Plaintiff's children to act as interpreters, and Plaintiff's ability to communicate through writing messages and reading lips. The Court disagrees with Defendant's assessment.

The regulations require Defendant hospital to provide effective communication, a requirement that cannot be satisfied by relying on interpretation performed by Plaintiff's children where they were not available to be present at every interaction with Plaintiff's doctors and nurses. Plaintiff requested a qualified interpreter, and she alleges that Debra Drawdy was not skilled enough in sign language interpretation to meet her needs. Further, Plaintiff alleges she was a patient in Defendant hospital for close to a month before Kitty LaFountain was contacted to interpret. If true, Defendant hospital has not complied with the federal regulations created to effectuate the ADA. As a result, Defendant

hospital is not entitled to a judgment in its favor as a matter of law that it complied with the ADA and the RA. Accordingly, Defendant hospital's Motion for Summary Judgment is DENIED regarding Plaintiff's ADA and RA causes of action.

### 2. Compensatory damages

Notwithstanding the above ruling on the ADA/RA claims, Plaintiff also seeks compensatory damages for the alleged violation. In order for Plaintiff to recover compensatory damages, Plaintiff must demonstrate "intentional discrimination or bad faith." Wood v. President & Trustees of Spring Hill College in City of Mobile, 978 F.2d 1214, 1219 (11th Cir. 1992). For Plaintiff to demonstrate intentional discrimination in the ADA and RA contexts, "she must show that someone with authority to take corrective action, i.e. a supervisor, had notice of [her] condition and an opportunity to accommodate [her] special needs." Ortega v. Bibb County School District, 431 F. Supp. 2d 1296, 1302 (M.D. Ga. 2006). "Evidence tending to demonstrate that the person with authority was deliberately indifferent to [her] special needs may be sufficient, inter alia, to show intentional discrimination." Id.

Here, Plaintiff contends that Woodham, the Patient Representative, knew of her son's request for a certified interpreter on April 7, 2004, and that it wasn't until April 24 that Kitty LaFountain was hired to assist her. Defendant challenges such a suggestion, contending that it was diligent in its efforts to secure a certified interpreter, looking in a 100-mile radius for any available interpreters. However, Plaintiff contends that there were several interpreters that would have been readily available during the time of her hospitalization that were never contacted. In light of the factual dispute regarding Defendant hospital, and more specifically, Ms. Woodham and Ms. King's attempts to secure a qualified interpreter for Plaintiff, the Court finds that there is no absence of genuine issues of material fact that would make summary judgment an appropriate measure. Accordingly, Defendant

hospital's Motion for Summary Judgment is DENIED with respect to the issue of compensatory damages.

### B. Intentional Infliction of Emotional Distress

In Count Two of her Complaint, Plaintiff sets forth a cause of action for the intentional infliction of emotional distress. She asserts that Defendant's actions were outrageous and were committed willfully and with malice. Indeed, where a defendant's conduct is malicious, wilful or wanton, recovery for a plaintiff's emotional distress can be had without the necessity of an impact. Ryckeley v. Callaway, 412 S.E.2d 826, 826 (Ga. 1992); Westview Cemetery v. Blanchard, 216 S.E.2d 776, 779 (Ga. 1975). Defendant challenges such a claim, contending that its conduct could not possibly have approached the level required to make the requisite showing necessary to support the allegation.

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." Blockum v. Fieldale Farms Corp., 573 S.E.2d 36, 39 (Ga. 2002) (citing Yarbray v. Southern Bell Tel. & Tel. Co., 409 S.E.2d 835, 837-38 (Ga. 1991). Georgia courts have interpreted the tort to consist of four requisite elements that must be established for a plaintiff to make out a cause of action for intentional infliction of emotional distress: (1) conduct that is intentional or reckless, (2) conduct that is extreme or outrageous, (3) causal connection between conduct and emotional distress, and (4) severe emotional distress. See, e.g., Udoinyion v. Re/Max, 657 S.E.2d 644 (Ga. Ct. App. 2008).

Here, without any legal analysis, Defendant simply contends that the facts do not exist to sustain such a claim. Defendant only references one element of the four-part test in its memorandum in support of its motion, and this in an argument that consisted of two sentences. Specifically, Defendant challenges Plaintiff's ability to satisfy the first prong of the test by referring to her own

11

deposition where she admitted that none of the staff at TRMC "deliberately wanted to hurt her." (Def's. Memo, doc. 21-2, at 18.) Plaintiff disagrees, countering that the facts do exist, although she fails to articulate exactly which facts support each prong of the test for intentional infliction of emotional distress.

With such a conclusory argument presented by Defendant, it is questionable whether Defendant hospital has satisfied its Celotex burden to demonstrate the absence of a genuine issue of material fact. 477 U.S. at 323. All Defendant has done is challenge Plaintiff's ability to satisfy the intentional prong of the first element, but it is silent on the recklessness aspect of the element. Looking at the facts in the light most favorable to the non-moving party, the Court is unable to find as a matter of law that Defendant did not intentionally inflict emotional distress on Plaintiff as contemplated by Georgia law. Accordingly, Defendant's Motion for Summary Judgment is DENIED with respect to Plaintiff's emotional distress claim.

### C. Punitive damages

In Count Three of her Complaint, Plaintiff claims that Defendant's alleged misconduct was wilful, wanton, and malicious, so as to justify an award of punitive damages. However, "[b]ecause punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act." Barnes v. Gorman, 536 U.S. 181, 189 (2002). Rather than challenge the aforementioned proposition asserted by Defendant in its brief, Plaintiff sought to withdraw her claim for punitive damages. Instead of treating Plaintiff's "withdrawal of claim" as a formal amendment to her Complaint–for which she would have to seek leave through a motion filed with the Court–the undersigned will treat it as a concession, and proceed as though Plaintiff chose not to challenge Defendant's argument. Therefore, due to Plaintiff's concession, and the Court's agreement with

Defendant on the unavailability of punitive damages in ADA/RA cases, Defendant's Motion for Summary Judgment on this issue is GRANTED.

### IV. CONCLUSION

It cannot be said that, as a matter of law, Defendant hospital complied with the federal regulations charging it to provide effective communication to Plaintiff while she was a patient. Further, there exists an issue of material fact as to whether representatives of Defendant hospital exhibited bad faith in failing to secure for Plaintiff a qualified interpreter. Finally, whether Plaintiff's ordeal with having a tube forced down her throat qualifies as intentionally inflicted emotional distress is for a fact finder to decide. Accordingly, Defendant's Motion for Summary Judgment is GRANTED IN PART, and DENIED IN PART. Plaintiff's claim for punitive damages is DISMISSED.

SO ORDERED, this 31st day of July, 2008.

/s/ *Hugh Lawson*
HUGH LAWSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

HL/cbb